case number 19-5087 at L. Shands Jacksonville Medical Center in, doing business at U.S. Health Jacksonville at L. Affinity Hospital, LLC, 14-CP-1477, doing business at Trinity Medical Center at L. Appellant v. Alex Michael Azar, II, Secretary of Health and Human Services. This ruling for the appellants, Mr. Pullen for the appellate. Good morning, your honors. Again, I'm Lori Rubin. I'm appearing on behalf of the hospitals who are the appellants in this case, and I've asked to reserve five minutes for rebuttal. May it please the court, the stakes in this case are high. The secretary's position is that agencies can totally botch rulemaking procedures as long as they later act reasonably in response. That encourages bad rulemaking. His approach would also mean leaving in place rules that violate the APA in open defiance of the APA's mandate. His approach would also deprive parties a chance to be heard on their live, non-moot controversies. In contrast, our approach is that vacater of arbitrary agency rules is not only required by the plain language of the APA, but also incentivizes agencies to engage in proper rulemaking from the get-go and leaves parties free to pursue live controversies. So doesn't the dispute really come down to whether the district court, the first time around, properly decided to remand without vacating? All of what you're saying may be right in the abstract, but we have this settled doctrine allowing courts to do that. And district court did that, and it did so precisely to preserve the option of fixing things going forward rather than having to retroactively undo everything. Yeah, Your Honor, I agree that in the district court below, we believe the proper outcome was vacater from the get-go. The agency argued that it could fix the procedural deficiencies on remands, and the agency and the court did not even reach our arbitrary and capricious challenge below, which we also hoped that it would reach. And then upon remands, which Allied Signal provides that you can remand to the agency to give the agency an opportunity to fix the APA deficiencies, but on remands, the agency only addressed the procedural deficiencies and did nothing to cure the arbitrary and capricious deficiencies. So it's our view that now vacater was proper below, but now it's more proper than ever because the agency is no longer willing to even defend this role. Well, you say that, but the agency on remand cured or addressed the one legal problem identified by the district court the first time around, which was lack of adequate notice, right? And then the district court also addressed the problem of how to respond to the fact that this 0.2% reduction didn't seem warranted, right? And your position now is, you know, just disregard everything the agency said going forward because it was in a 2017 rulemaking. Well, Your Honor, the district court, I would respectfully disagree. The district court did not address the problem as to whether the 0.2% was warranted or not. The district court said the agency was not required to defend a rule that it no longer stood by, which we think is incorrect under the APA. Right, but from the agency's perspective on remand, they have a rule that the court has expressly decided not to vacate, and then they have this substantive problem, which is the reduction doesn't seem to be supported. But they're addressing it from what was a 2016-2017 perspective. They're addressing it whenever they're addressing it. Yeah, Your Honor, the problem is the APA requires that deficient agency rules be set aside. So because the rule is arbitrary and capricious, if we leave it on the books, that can have huge consequences for later rulemaking. It's only arbitrary and capricious if they lack a reasonable explanation for what they're doing. That's correct, Your Honor, I agree. Which doesn't necessarily take us to whether the agency reasonably addressed this problem from the perspective in 2016 or 17 when they realized that what they're doing doesn't make sense, and they have to figure out how to respond, and they can either try to go back three years and unwind everything, or they can try to fix things going forward. They have to resolve that problem reasonably, but that's what they try to do, and that's what we review. Well, Your Honor, I first want to explain that the rule was arbitrary and capricious in 2013 when it was promulgated. So from the start, promulgating a .2% rate reduction along with the two midnights policy was counterintuitive. It was based on actuary estimates where the actuaries themselves— Well, they're not disputing that. No. Oh, okay. Everybody's agreed. The question is where Judge Katz is. That's what we're looking at, and we get your point about that to go back to the beginning. He's pressing you, giving this document on remand without vacater. Sure, I appreciate the clarification, Your Honor. No, I'm sure you do, but the point is what's your best response, that even if there's no problem on the first remand, there's still a problem because what the agency did is still arbitrary or failed adequately to explain. Isn't that what you have to persuade us at this point? Your Honor, so— In other words, we have all these cases involving these very complicated statutory schemes where, candidly, we have given the agencies a lot of leeway because you can't fix them always, and the agency cites all those reasons. Is that enough? Well, Your Honor, the agency cites case law that has to do with rulemaking in the first instance. I understand that. And whether rulemaking is arbitrary and capricious. That's not our situation. Our situation is under the APA. These rules must be set aside. They did not fix— Let me just ask. What if the rule that they announced, the 2017 rule, is we'll pay you back everything? Yeah. We're going to make you halt. But we're not going to vacate our previous rule. We're just going to make you halt. Would you have an objection? Would there be some claim that there's something wrong with not vacating the rule under those circumstances? Your Honor, in my view, that would moot out plaintiff's claims. So if they were able to moot out plaintiff's claims with the rulemaking, that would— I'm not asking you. But you just told me it leaves on the books something bad. But it actually doesn't leave something on the books bad because their new rule would solve the problem, right? So the answer isn't that we have to vacate in order to not leave something bad on the books, right? Well, Your Honor, I would add a distinction there, right? So I think that if you're leaving something on the books that's now a moot point because parties have been fully restored, that's entirely different than leaving a non-moot rule that's been properly challenged on the books. So the next question is why isn't what they've done the best that they can do, given the complexity of the system? Well, I think— Your opening brief suggests this is really easy. Just multiply it by a different number. Whatever number we gave, whatever number they gave you, 0.2 off, multiplied by 1.2, something like that, you said, right? Is that correct? Is that really all that would be necessary with respect to every hospital? Just multiply whatever we gave you before by 1.2. Is that the number you said, 1.2? Your Honor, it's 1.002, a factor of that, multiplied by payments made to hospitals. Right, but would that have solved the problem? And that would be completely correct? It would be a make whole solution if you multiply by 1.002? Well, it's interesting, Your Honor. So the agency is attempting to make it into a much more complicated issue, and they only pointed one example. That's the key. What's your view? My view is it's that simple, it's that straightforward. The one example the agency set forward about why it's complicated is such a peripheral butterfly effect situation that can't be measured, that can't be mathematically calculated, that if you look at what you can calculate precisely, then yes, it is simple and straightforward to do. Other than that one question about outliers, all you have to do is multiply for every hospital? Yes, if done correctly and applied to the final amounts paid and the final amounts adjusted. I believe that's correct, Your Honor. And why isn't what they did, which was to add that up for the three years, give up 0.6 or whatever the correct decimal place is, why wasn't that okay? Because the agency's fix was a 0.6% adjustment in fiscal year 17 to fiscal year 17 inpatient admissions. But because for many hospitals, inpatient admissions declined, including because the two midnights policy caused a decline in inpatient admissions for many hospitals, it didn't fully compensate them for their deficient rate pay. Because they're not multiplying by the past admissions, they're doing it prospectively. Correct, Your Honor. Let me ask just one further question. You have in footnote 12 your answer to what I think is a pretty serious problem on the part of your clients, which is I take it some of your clients did better than they should under your theory, correct? Your Honor, the fact that, yes, I think that hospitals are still doing those calculations. Some of them may have come out better, and some of those may be withdrawing that portion of the appeal, but not the interest portion of the appeal. But the fact that some did better and there were winners and losers just proves the point that it hasn't been set aside as required. So why don't the winners have to pay – if they did better than they should have, why don't they have to pay it back? And do they realize that by bringing this suit they are opening themselves up to a clawback? Well, Your Honor, first of all, I'm not aware of any mechanism by which they could claw back the 0.6 percent increase. If we ordered a make-whole order now, and this is above the make-whole order, which is what you're asking us to do, why wouldn't we order that anybody who was more than made whole should pay the money back so that the money can go to the people who weren't made whole? I'm not sure under what authority a recruitment could be taken, and that's partially because, you know, this is the self-inflicted wound by the agency, right? The agency shouldn't get to get away with skirting APA requirements by coming with a proposal that they think is good enough. If the government pays you too much money by mistake, they get it back. It's not like too bad government. If my savings account gets a direct deposit of more than my monthly salary, it's not mine. I have to give it back, and they can get it back. Why aren't some of your clients in that same circumstance? Your Honor, I acknowledge that some of our clients may have come out ahead. I'll stand by it. I don't think there's a mechanism by which it could be recouped, and I see that I'm out of time. My guess is the government will come up with one. Well, and I think that will spawn more litigation, Your Honor. Your exchange with Judge Garland just proves that this can't be solved globally by changing the .06 to some other number that you like more. Because it's hospital by hospital, the reason why the attempt to undo the consequences is a little bit imprecise. And if you have a hospital with declining admissions, they're going to get a windfall, right? If you have a hospital with increasing admissions, maybe I got that backwards, but there's a windfall or a shortfall depending on whether admissions for the particular hospital are increasing or decreasing. And that's assuming that everything else is constant, but I'm pretty sure in the context of Medicare, not everything's going to be constant. So they're going to have to do this redo at every hospital, every admission, figuring out how to make them whole. That seems like a massive undertaking. The Secretary's approach is the imprecise one, that where there's winners and losers, the .6% increase. If they actually restore what they took by the rate cut, that is not an imprecise calculation, other than the butterfly effect of totally unpredictable outlier payments. But is the assumption underlying the judge's question correct? In other words, doesn't the Secretary already have this information? All right, so it's just a matter that if somebody, a hospital system, received, I don't know, $5,000 more, it's easy to tell, just go in the computer, look at the data, and tell them to pay $5,000 back, assuming there's authority to do all that sort of thing. But I'm just not clear that we're talking about starting from scratch, going through this colossally complex calculation, hospital by hospital, since other requirements under the statutes and regulations require this data to be provided to the Secretary. But it doesn't mean it's not complex, but I just want to be clear that how complex is it? What I'm trying to understand is the distinction between the argument that agencies can't be sloppy about how they do rulemaking. If they are, and it's arbitrary and capricious, then they have to make a correction, and they cannot simply rely on administrative convenience. All right? A lot of these statutory schemes are necessarily complex. And what I'm trying to understand, while our court has given leeway in these complex schemes, is this the type of system where such leeway should be accorded, and the normal administrative convenience argument fits? It's not going to fit every situation, and that's what I think is difficult to grasp, at least based on my knowledge of the record in this case, looking at the hospital submissions. Your Honor, the Secretary should know exactly how much it paid every single hospital for the three fiscal years at issue and should be able to simply multiply that by 1.002. I'm not saying it's not administrative work. Let me just ask, your brief says 1.02. Yes, our opening brief inadvertently left out an extra zero, I believe. Thank you. All right. Our reply brief corrected that. So one side of the balance is what Judge Rogers just asked you about, which is how complicated is it to do this better. The other side of the balance is how important is it to do better. So do we have any sense of how inaccurate the 0.6 for one year going forward to compensate for 0.2 for each of three years backwards. I mean, at first cut, it seems like it should be approximately right. Of course, it won't be exactly right because of all sorts of complicating factors, but how far off is it? You're right, your Honor, and there's not a large amount of money at issue in this case. There's not a large amount of money at issue in this case in terms of the Medicare program as a whole. The last figures I saw, it's not in the record, the last figures I saw were approximately $1.5 million discrepancy for hospitals that were harmed, exclusive of interest. Per hospital? I can't understand these numbers. Per hospital? No, in the aggregate. The last figures that I saw. Some hospitals are still calculated. So in response to Judge Katz's question, we're talking about a very small amount of money to each hospital? That's correct, your Honor, and setting good policy. And so why are they bringing this very expensive litigation? Your Honor, there were many hospitals below who significantly benefited from the 0.6% increase and were part of the case below. The appellate court level was another step, and also to secure interest for every fiscal year, that's at issue. Ah, interest. So it could be significant money for a number of hospitals. I just need to be clear about this. I understand your principle, and so does Judge Katz's. Now we're trying to figure out what's at stake. For certain hospitals, there's, you know, a chunk of cash at stake. Chunk of cash. It depends on the hospitals, your Honor. So for all of the hospitals, additional interest is at stake. And hospitals, you know, can take every increase to their budget line that they can get these days. Thank you. Thank you, your Honor. Good morning. Good morning, your Honors. May it please the Court, Thomas Poland for Secretary Azar. I'd like to begin. Mr. Poland, could I? Please. I think that my colleagues have nicely pointed to the question here. So if we could begin with, I think, the question that the Chief Judge was ending with, which is why can't the Secretary just multiply the amounts that were actually paid during the relevant years by 1.002? Why is that less? The reasons that the agency gave, which are transparency, expediency, and administrative feasibility. Why doesn't this solution fit those criteria? So a couple of reasons. First, I think we have to look at where the world was when the Secretary made this decision. At that time, that knowledge wasn't available. The Secretary won't know how much a hospital is paid for a given year until there's been a full accounting and reconciliation of the claims for that year, going through the contractor review and all that dispute process. That can take several years. So at the time when this was done in 2016, it simply would not have been known the total payments for the hospitals for the affected years. So that's one very big reason. Another, when we're looking at the reasons advanced by the Secretary, expediency, transparency, feasibility, the Secretary adopted a mechanism by which the hospitals could start getting paid right away. This one-time increase was added to the very next year's payments, so that money was going to start going out right away. And so I think for that reason and several others, as the Secretary noted, the vast majority of commenters supported this approach because they could see, they could estimate how much they were going to get. That helps with their planning, knowing that their rate is going to go up by a fixed amount the next year. It gets them the money sooner. They're saved the administrative burden of going through multiple cost reconciliation processes, one for the old rate and then again for the new rate. So when we're looking at the time that the Secretary made this decision, there was a very big difference between these two possible solutions. Another reason which we talked about is the hospital's proposed solution is just a different approximation of what the difference would have been, and we pointed to the example of outlier payments. As your honors know, this system is very complicated. There are many interdependent provisions. You change one thing, that can affect other parts of the system. Council described outlier payments as kind of a peripheral butterfly effect, but up to 50% of hospitals in a given year will receive an outlier payment. So this isn't just some very small thing at the margins. But those payments, what I'm trying to understand is everything you may say may be correct.  And the fact that a number of commenters said, yes, we want our money now, does that solve all problems? Well, I think it underscores the reasonableness of the Secretary's solution. And I'd like to address the interest that your honor mentioned. The Secretary stated in the 2017 rulemaking that she would not oppose interest under 1395-00F2 for any hospital that had a pending lawsuit for a given year. And that process has been going on. Those interest payments are being made. It's not fully finished yet, but that's been a cooperative process between the Secretary and the hospitals to get those interest payments made. And how is that being done? Is it on just a flat percentage basis in terms of this 1.002? And interest on that? Or is it hospital by hospital? So the way it's done is it's an incremental adjustment to the one-time increase that's being applied to the 2017 rates. So the interest rate is set by statute, or statute tells you where to look for that. And so my understanding is what the Secretary has done is added kind of a little increment to the one-time adjustment in 2017 to account for that interest. And basically the hospitals get interest for every year for which they had a lawsuit pending. So if they had three challenges, they get an interest adjustment to each of the 0.2 components that adds up to 0.6. And so that interest, as your Honor indicated, that adds money, but that is being taken care of. So there's no dispute that any hospital that had a lawsuit pending would receive interest on the disputed amount in that lawsuit. So who loses out in this scheme? So as the Secretary acknowledged, there will be some hospitals that come out ahead and some that come out behind, but... I'm trying to understand which they are. In other words, the well-funded suburban hospital is doing okay. The urban underfunded hospital is not doing okay. I don't know that there's any reason to think that would be the case. Certainly there's been no such argument here. I don't think there's any reason to think it would fall on one or the other. The most obvious example of hospitals that are going to be shortchanged are the ones that are closed. That's right. And so substantially declining. That's right. So a hospital might have closed or a hospital might have converted to a different type of institution. And for the extreme cases of closed or converted, you've addressed that. That's right. That was raised in the notice and comment period, and the Secretary realized that those hospitals would not receive the benefit of the proposed solution. And the Secretary said, for those small number of hospitals, we can address that through the cost reconciliation process. So there shouldn't be, and nothing has been pointed out to the Secretary, that there's some class of hospital that's especially hard hit by this. It will be kind of. And is there any reason to think, there are lots of reasons to think that the approximation will be a little bit too high for some, a little bit too low for others. Is there any reason to think that in the aggregate it won't, you know, the .06 going forward for one year gain won't be commensurate with the .02 times three over three years losses? I don't think so. I mean, the hospitals have suggested that it could be because there was a decline in patients. A global decline. I mean, that won't be true for all hospitals. And one thing to take into account is that the .6 adjustment is being applied to a higher rate. Payments are higher now than they were, or they're higher in 2017 than they were in 2014. So there's, you know, a little bit of factor that way. This isn't in the record. My understanding is that there is not reason to believe that there is a global deficiency. So if there are any other questions, I'm happy to address them. Otherwise, we would ask that the district court's decision be affirmed. I'm sorry, just on the interest question. Of course, please. Could you just go through the statutory explanation for why it's year by year? Yes. So this court explained in Tucson Medical Center that when we're applying this interest provision, the court considers three factors. One is whether the hospital sought judicial review under 1395 OOF1. The second is whether there was an amount in controversy. And the third is whether they were prevailing parties. Of course, this is a statute that abrogates sovereign immunity, so we need to construe it narrowly and be very careful about what we're talking about here. The first requirement limits the hospitals to the years for which judicial review is sought. Judicial review is sought here by going to the board for either a rule or a final cost report for a specific year issue. The board either, in this case, decides that it can't address the challenge, and so it grants expedited judicial review. It does that for the particular subject year. So the challenges that actually went to the board were only for specific years? That's right. And the board specifically said, we don't have jurisdiction to consider this issue for the subject year, so expedited judicial review is granted for the subject year. That language is in all of the letters from the board. And so in Tucson Medical Center, this court cited with approval two decisions from other courts. One was the Fifth Circuit's decision in Riley. The other was a district court decision from the Northern District of California. And this court said that those decisions were correct in denying interest because judicial review hadn't been sought for the specific years on which interest was sought. And this also comes into play in the second factor in the inquiry, which is the amount of controversy. The amount of controversy, this court explained in Tucson Medical Center, is set at the time the complaint is filed. And as the Fifth Circuit explained in Riley, it can't exceed the district court's jurisdiction. So when a hospital brings a suit challenging the payment rate for 2014, the amount of controversy is the rate that applies to that year. It doesn't go beyond what the board authorized or what you can identify at the outset. Thank you. Sorry, just one more. Of course, back to the main point. What agency action are we actually reviewing? Is it the failure to vacate the 2014 final rule or the promulgation of the 2017 final rule or both? I think it's the, I mean, the action that's here before this court, I think, is the secretary's decision to prospectively remove the 0.2% reduction that was adopted in 2014. The 2017. I think so. I mean, it's all kind of wrapped up into one. It's jumbled and it makes strong, intuitive sense to talk about everything together. I just want to make sure there aren't any procedural problems because, I mean, one way of thinking about this case is the agency action that was challenged is the 2014 final rule, and that's what's before us. And if someone wanted to challenge the 2017 rule, they would have to satisfy presentment, exhaustion, PRRB requirements, which hasn't been done here. That's right. Are we taking any shortcuts in just clombing those two together? I really don't think so. I mean, I think it makes good sense, as Your Honor suggested, and these were actions that were taken on remand from the district court in a matter over which the district court, you know, everyone agrees had jurisdiction to consider. The district court remanded for additional proceedings. It was, I think, clearly contemplated by the fact that it was a remand for notice and comment that the agency action could change. That's the point of notice and comment. And so it all came back to the district court. And I don't think there's any reason why, just because the secretary used the 2017 rulemaking, which was kind of the next train to leave the station, the secretary used that to attach the remand proceedings to, there's no reason why that divested the district court of jurisdiction to consider what happened on remand. Even though it's a separate agency action which might have its own presentment and exhaustion type requirements? Yeah, I don't think so with respect to what happened on remand. The district court, when it set this for remand, it set a timetable by which things needed to be done. It said, you know, if the action's not corrected, I will vacate it. I mean, it clearly contemplated an ongoing jurisdiction gap. No doubt that's what the district court contemplated. I guess I just want to make sure that that isn't short-circuiting. Procedural and jurisdictional aspects of Medicare are awfully complicated, and some of them are jurisdictional. Right. I don't think there's any reason to think that the district court lost jurisdiction over the matter, simply because the agency kind of used the 2017 rulemaking as a vehicle to put this out there. And have jurisdiction to review a later agency action without presentment and exhaustion. I think that's right. Because the district court had jurisdiction, as Judge Moss explained, you know, he clearly had jurisdiction over the 2014 rulemaking. This was additional notice and comment to, you know, provide further action on that particular rulemaking. So I don't think there's any reason why there would be a jurisdictional problem, nor as a practical matter would that be a kind of sensible approach to this, to bifurcate the Secretary's actions and only look at part of them. So you're reading the 2017 rule really as 2014 extended as distinct from separate training. I think that's right, because that's what the Secretary was doing. He was correcting a problem in the 2014 rulemaking. Thank you very much. Your Honors, I know I'm out of time, but if it's all right with you, I'd like to address the relevance of fiscal year 2017, as well as the interest issue. First, the fiscal year 17 rule is not before the court. As Judge Katz has pointed out, it hasn't been appealed by the parties via expedited judicial review, granted by the PRB in this matter. So in our view, this court does not have jurisdiction over it. There's two cases that rule on this issue that we cited in our briefs, the Tallahassee case out of the 11th Circuit, where the 11th Circuit held that the later rulemaking could not prevent the court from considering ordering relief in the as-of-old rulemaking, other than to consider whether it mooted the issue, which it did not. But it is artificial to separate the two in the circumstances of this case, right? It's perhaps a challenge. I wouldn't call it artificial, Your Honor. They were separate rulemakings. Suppose we take a formalistic view and think that all that we're reviewing is the refusal to vacate the 2014 rule. Even if that's true, why can't we determine that question by looking at everything else the agency has done, looking at, by hypothesis, a separate rulemaking docket from 2017, which we can judicially notice, and all of that informs the 2014 decision? Well, Your Honor, vacate means to set aside and to restore the rules that were in place prior to the deficient rulemaking. So we're comfortable with considering the fiscal year 17 rule in terms of seeing whether it mooted the party's claims, whether it fully restored the status quo prior to the fiscal year 14 rate cut, but it didn't. Or whether it provides a reasonable explanation for the refusal to vacate. Your Honor, I respectfully disagree that that's not the standard in this case. The agency doesn't get deference on how to implement the APA's requirement that it be set aside. Set aside does not mean reasonably addressed. It means restore the parties to the status quo. Well, but now we're back to the remand without vacating point. Well, Your Honor, that was a remand to see if the agency could fix the rule respectfully. The agency can't. The agency has now abandoned the rule. We also cited AHA v. Azar where the D.C. District Court vacated a 2019 payment rule, considered a challenge to a 2020 payment rule in the same case that rested on the same justification, and the District Court held that it lacked jurisdiction as a technical matter and therefore lacked jurisdiction. I realize that's a District Court decision, but it applies here. And more importantly, even if there weren't a jurisdictional issue as to the fiscal year 17 rule, the standard is not whether the agency acted reasonably because the APA requires that the deficient rule be set aside. All right. I'd like to address the interest issue. Just I'll be brief. The amount of controversy in this case is the full impact of the rate cut, and unlike the cases the Secretary cited in support for the interest arguments, this case was about a rate cut that was promulgated in 2013 to apply for every single future year. So it's not that the amount of controversy is determined at the time the complaint is filed. It's the full impact of the rate cut, which impacted every year, 14, 15, 16, without any additional action by the agency just by virtue of the reduction to the standardized amount. And I'll also say the language in the board decisions that references subject year is not binding language. It's standard language. In our view, it doesn't restrict the appeal in that way, and also because the board decisions say that the legal question in those cases was whether the 0.2% adjustment was proper. That 2% adjustment was done for fiscal year 14, and not again and again it was simply compounded. Thank you, Your Honors.
judges: Rogers, Garland, Katsas